UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------------x
ANTHONY MARRACCINI,                                      :
                    Plaintiff,       :
v.                                                       :
                                                         :
RONALD BELMONT, Supervisor of the Town                   :
of Harrison, New York, and Mayor of the Village          :
of Harrison, New York; FRANK ALLEGRETTI,                 :
Town Attorney of the Town of Harrison, New               :
York, and Village Attorney of the Village of             :
Harrison, New York; FRED SCILIANO, Deputy                :
Supervisor of the Town of Harrison, New York,            :
and Deputy Mayor of the Village of Harrison,             :
New York; STEPHEN MALFITANO,                             :
Councilman of the Town of Harrison, New York,            :
and Trustee of the Village of Harrison, New              :
York; JOSEPH STOUT, Councilman of the Town               :
of Harrison, New York, and Trustee of the                :
Village of Harrison, New York; TOWN BOARD                :
of the Town of Harrison, New York; VILLAGE               :
BOARD OF TRUSTEES of the Village of                      :
Harrison, New York; TOWN OF HARRISON,                    :
NEW YORK; and VILLAGE OF HARRISON,                       :
NEW YORK,                                                :
                    Defendants.      :
--------------------------------------------------------------x

**OPINION AND ORDER**

19 CV 8458 (VB)

Briccetti, J.:

       Plaintiff Anthony Marraccini brings this action under 42 U.S.C. § 1983 against

defendants the Town of Harrison (the "Town"), the Village of Harrison (the "Village"), the

Town Board, the Village Board of Trustees, Town Supervisor and Village Mayor ("Supervisor")

Ronald Belmont, Deputy Town Supervisor and Deputy Village Mayor Fred Sciliano,

Town/Village Attorney Frank Allegretti, and Town Councilmen and Village Trustees Stephen

Malfitano and Joseph Stout, alleging violations of plaintiff's Fourteenth Amendment due process

rights and retaliation for plaintiff's exercise of his First Amendment right to free speech and

political association.  Plaintiff also brings several related state law claims.

Now pending are defendants' motions to dismiss the complaint pursuant to Rules 12(b)(1) and 12(b)(6) (Doc. #42) and for sanctions pursuant to Rule 11 (Doc. #55).

For the reasons set forth below, the motion to dismiss is GRANTED and the motion for sanctions is DENIED.

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

## BACKGROUND

For the purpose of ruling on the motion to dismiss, the Court accepts as true all well-pleaded factual allegations in the complaint, and draws all reasonable inferences in plaintiff's favor, as summarized below.

Harrison is both a Town and a Village.[1]  Accordingly, at all times relevant to plaintiff's claims, Supervisor Belmont was both Town Supervisor and Village Mayor, Sciliano was both Deputy Town Supervisor and Deputy Village Mayor, Malfitano and Stout were both Town Board Councilmen and Village Trustees, and Allegretti was both Town and Village Attorney.

I.    Plaintiff's Employment

Plaintiff joined the Harrison Police Department (the "Department") as a police officer in 1984.  Thereafter, he was promoted several times, and in March 2010 he was promoted to Chief of Police.  Plaintiff served as Chief until his resignation on October 7, 2016.

Plaintiff claims that with every promotion (from officer, to sergeant, to lieutenant, to captain, and finally, to Chief), he "'carried over' certain time . . . earned in a lower rank." (Doc. #1 ("Compl.") ¶ 25).  In other words, according to plaintiff, compensatory, holiday, personal, vacation, and sick time carried over with each promotion, and could either be counted towards days off from work or claimed as hours worked.

---

[1]    The Town and Village are collectively referred to herein as the Town.

Plaintiff further alleges that as Chief, he "frequently worked in excess of an eight-hour day or a forty-hour week," and often responded to emergencies and activities outside of regular working hours. (Compl. ¶ 27). Plaintiff claims he would record these excess hours as "accrued hours," which he then would apply to time during which he was not at work. (Id.). In other words, instead of taking vacation, personal, or sick time for time he was out of the office, plaintiff would use his "accrued hours" to get paid for those days.

Plaintiff alleges this method of recording and using accrued hours was the common practice of former Chief of Police David Hall, who preceded plaintiff in that position, and that defendants were familiar with it. For instance, plaintiff alleges an "investigation [of former Chief Hall's hours recordation and use was] conducted by an independent party . . . some time prior to 2010," and that the investigation "revealed no improprieties or discrepancies regarding the working of overtime and/or use of compensatory time and/or scheduling and/or accrual and use of time off, however designated." (Compl. ¶¶ 41–42). Plaintiff also claims that throughout his tenure as Chief, defendants never objected to the balances for compensatory, holiday, personal, vacation, and sick time listed on his bi-weekly pay stubs. (Id. ¶ 47).

II.    Plaintiff's Political Association

Supervisor Belmont was first elected Town Supervisor in 2011. Plaintiff alleges that he and his wife, Tabatha Marraccini ("Tabatha"), supported Supervisor Belmont during his 2011 and 2013 political campaigns, by attending functions and hosting fundraisers.

In 2015, however, plaintiff's brother, Philip Marraccini ("Philip"), ran against Supervisor Belmont in the Republican primary to become the party's candidate for Supervisor and Mayor. Plaintiff and Tabatha supported Philip in his campaign against Supervisor Belmont.

During his 2015 primary campaign, Philip filed a lawsuit in Supreme Court, Westchester County, against Supervisor Belmont, challenging certain signatures Supervisor Belmont had obtained on his nomination petitions.  Plaintiff claims he assisted his brother Philip in contacting witnesses to testify at hearings in the lawsuit.  At one such hearing on July 21, 2015, the court heard testimony from witnesses who said Supervisor Belmont had improperly notarized signatures on his nomination petitions, thereby attesting that he had witnessed their execution, even though he had not.  (Compl. ¶ 63).  Supervisor Belmont then testified and admitted to having notarized signatures that he had not witnessed.  (Id. ¶ 64; see also id. Ex. F).

On September 10, 2015, Supervisor Belmont defeated Philip in the Republican primary election.[2]  Belmont then won the general election on November 3, 2015, and was re-elected Supervisor and Mayor.  (Compl. ¶ 60).

Plaintiff alleges upon information and belief that Supervisor Belmont and defendants considered "as a personal affront" plaintiff's and Tabatha's support of Philip's campaign to unseat Belmont, and "vowed revenge against" plaintiff.  (Compl. ¶ 90).  In addition, plaintiff states upon information and belief that Supervisor Belmont "held a grudge against Plaintiff as a result of his embarrassment at having to admit the falsity of his oaths as a Notary Public."  (Id. ¶ 91).

III.    Other Alleged Retaliatory Motives

Plaintiff alleges that in 2013, Supervisor Belmont "confided in Plaintiff that he was concerned the Democratic Party would expose [Belmont's] relationship with his girlfriend"—a

---

[2]     The Court takes judicial notice of the date of the primary election.  See Harrison to Have First GOP Primary for Supervisor in Decades, NEWS12: WESTCHESTER (Sept. 3, 2015), http://westchester.news12.com/story/34895791/harrison-to-have-first-gop-primary-for-supervisor-in-decades.

4

relationship not known to Belmont's wife—"in an effort to damage his political campaign." (Compl. ¶ 65).  According to plaintiff, Supervisor Belmont asked plaintiff, through his position as Chief of Police, to "look into this issue," and inform Belmont of any information he uncovered.  (Id.).

Plaintiff further alleges upon information and belief that through his position as Chief of Police, he "became aware of certain other conduct involving [Supervisor] Belmont and members of the [Town] Board that was potentially criminal in nature, that could have resulted in public embarrassment to [Belmont] and another member of the Board."  (Compl. ¶ 66).  Plaintiff also claims upon information and belief that through his position as Chief, he "became aware of potentially criminal activity of the son of a member of the Board in which the son was suspected of sexual conduct, potentially involving a minor."  (Id. ¶ 67).

Furthermore, although he does not specify when, plaintiff alleges upon information and belief that Supervisor Belmont told him:  "You and your brother ruined my daughter's wedding and you're going to get yours."  (Compl. ¶ 92).

Plaintiff states that sometime in 2015, it became apparent to him that due to his and Tabatha's support of Philip's 2015 primary campaign, and plaintiff's knowledge of certain inappropriate and potentially illegal conduct of Supervisor Belmont, Town Board members, and a Town Board member's son, "Belmont and the Board no longer wanted Plaintiff to be involved with the Town/Village, and wanted to discredit Plaintiff, in the eyes of the public."  (Compl. ¶ 68).

IV.    Plaintiff's Resignation

Plaintiff alleges that defendants' efforts to retaliate against him culminated in October 2016.  Specially, plaintiff states non-party Town/Village Attorney Jonathan Kraut told plaintiff

that "if he did not resign . . . immediately, [Supervisor] Belmont and the Board would suspend him without pay, immediately terminate his medical benefits, and then bring charges that would result in termination for cause." (Compl. ¶ 69). And defendant Stout allegedly told plaintiff during a private meeting in October 2016 "that [plaintiff] was being suspended from his job as Chief, based on a Town Board Resolution of 2000 which stated that department Heads were not entitled to overtime pay." (Id. ¶ 74).[3]  Plaintiff claims he was not aware of such resolution until that conversation.

Plaintiff alleges that on October 7, 2016, he resigned from the Department based on Supervisor Belmont and the Town Board's promise "that if he did resign . . . immediately[,] he would be paid in full at his current pay rate for all of the accumulated hours that the Town/Village had on record for him, in addition to all sums he was owed." (Compl. ¶ 69). According to plaintiff, defendant Allegretti procured plaintiff's resignation "with the knowledge that [Supervisor] Belmont and the Board did not intend to pay [p]laintiff the sums owed to him" despite such assurances. (Id. ¶ 71).

According to plaintiff, at the time of his resignation, he was owed 366.25 hours of compensatory time, 112 hours of holiday time, 188.5 hours of sick time, and 1,195 hours of accrued vacation time. (Compl. ¶ 49). Thus, plaintiff claims he was owed 1,861.75 hours of unpaid time, equal to $165,167.94, at the time of his resignation. (Id. ¶ 50).

---

[3]     The Resolution to which plaintiff refers is Resolution 2000-69, dated January 5, 2000. (Compl. ¶ 74). It states "that it is the policy of the Town Board that Department Heads and other listed management personnel are not entitled to compensatory time or overtime," and lists "Police, Chief" as a department head or manager. (Id. Ex. B at ECF 3).

"ECF __" refers to page numbers automatically assigned by the Court's Electronic Case Filing system.

Plaintiff also claims several Town resolutions substantiate his entitlement to these unpaid hours.  For example, plaintiff alleges that on August 12, 2004, the Town Board adopted Resolution 2004-426—approving a request from former Chief Hall—which extended "to Chief Hall the same benefits that accrue to members of the Police Benevolent Association, as outlined in the Memorandum of Understanding ["MOU"] recently agreed to, for the life of the contract." (Compl. ¶ 32; id. Ex. B at ECF 5).  According to plaintiff, the MOU provided for "members"— sworn officers of the Department—"to receive one- and one-half hours for each hour of off duty time worked," specifying that payment "could be received in cash or compensatory time, at the member's option."  (Compl. ¶ 32).

Moreover, plaintiff alleges that other Town resolutions from 2013 through 2015, which compensated plaintiff for specific overtime engagements in which plaintiff had participated, including breast cancer walks and a golf outing, further substantiate his entitlement to overtime pay generally.  (Compl. ¶¶ 35–38).  However, plaintiff concedes that other Town resolutions, from 2002, 2004, and 2005, indicate that "in no event shall the Chief be paid compensatory time or overtime[.]"  (Id. ¶¶ 31, 33–34).

In addition to the above unpaid time, plaintiff further alleges he is owed $5,692 for "longevity pay earned in 2016 under the Contract and the Memorandum of Understanding in effect at that time."  (Compl. ¶ 55).  As grounds for same, plaintiff refers to Town Resolution 2002-571, adopted December 12, 2002, which states "the Police Chief is to be paid for unused holidays, longevity time, and a uniform allowance."  (Compl. ¶ 31; id. Ex. B. at ECF 4).[4]

---

[4]    Plaintiff acknowledges this Resolution also states that "in no event shall the Chief be paid compensatory time or overtime, or be conferred any other benefit pursuant to this resolution." (Compl. ¶ 31; id. Ex. B at ECF 4).

Next, plaintiff alleges that upon his resignation, he was entitled to, but did not receive, a $12,000 stipend for performing the function of police captain during 2016, in addition to serving as Chief.  According to plaintiff, the position of police captain had been vacant since his promotion to Chief, and in 2013, the Town Board passed Resolution 2013-261, which reads in pertinent part:

> In voting to approve the stipend the Board recognizes that the Chief of Police, in addition to performing his regular duties and responsibilities, is also performing the duties and responsibilities as Police Captain, as the position of Police Captain remains unfilled.  It is the collective view of the Board that the Chief of Police be compensated for his extra work and time.  The dollar value of the stipend is set currently at $1,500 per month . . . .  The stipend shall be paid as long as the position of Police Captain remains unfilled.

(Compl. ¶ 53; see also id. Ex B at ECF 11).  Plaintiff claims that in 2014, the monthly stipend was replaced with an annual $12,000 stipend.  (Id. ¶ 53).

In sum, plaintiff claims he is owed a total of $182,859.94 from the Department, comprised of (i) $165,167.94 for "time earned" as reflected on his final pay stub; (ii) $5,692 for longevity pay earned in 2016; and (iii) a $12,000 stipend earned in 2016.  (Compl. ¶¶ 50, 55).

V.     Plaintiff's Claims

Plaintiff contends he had a "commendable service record" with the Department, and that there existed no legitimate basis for demanding his resignation or terminating his employment. (Compl. ¶ 76).  Rather, plaintiff claims defendants forced his resignation in retaliation for his and Tabatha's support of Philip's unsuccessful campaign to unseat Supervisor Belmont.  Plaintiff further claims defendants have unlawfully failed to pay plaintiff compensation owed, in further retaliation for plaintiff's and Tabatha's exercise of their First Amendment rights.

Plaintiff pleads the following causes of action:  (i) retaliation for the exercise of his First Amendment rights to speech and political association; (ii) violation of due process; (iii) breach of contract; (iv) account stated; (v) promissory estoppel; and (vi) unjust enrichment.

**DISCUSSION**

I.   <u>Legal Standard</u>

In deciding a Rule 12(b)(6) motion, the Court evaluates the sufficiency of the operative complaint under the "two-pronged approach" articulated by the Supreme Court in <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 679 (2009).  First, plaintiff's legal conclusions and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the assumption of truth and are thus not sufficient to withstand a motion to dismiss.  <u>Id</u>. at 678; <u>Hayden v. Paterson</u>, 594 F.3d 150, 161 (2d Cir. 2010).  Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  <u>Ashcroft v. Iqbal</u>, 556 U.S. at 679.

To survive a Rule 12(b)(6) motion, the allegations in the complaint must meet a standard of "plausibility."  <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678; <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 564 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  <u>Id</u>. (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. at 556).

A court assessing a Rule 12(b)(6) motion may "consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint."  <u>DiFolco v. MSNBC Cable L.L.C.</u>, 622 F.3d 104, 111 (2d Cir.

2010).  Courts also may consider documents deemed "integral" to the complaint, id., and any matters subject to judicial notice, Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007).

II.     Personal Involvement

Defendants argue plaintiff fails plausibly to allege defendants Malfitano and Sciliano were personally involved in any deprivation of plaintiff's constitutional rights.

The Court agrees.

To adequately plead a Section 1983 claim, a plaintiff must "plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." Ashcroft v. Iqbal, 556 U.S. at 676.  Indeed, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under Section 1983." Wright v. Smith, 21 F.3d 496, 501 (2d. Cir. 1994).

> Supervisor liability under § 1983 can be shown in one or more of the following ways:  (1) actual direct participation in the constitutional violation, (2) failure to remedy a wrong after being informed through a report or appeal, (3) creation of a policy or custom that sanctioned conduct amounting to a constitutional violation, or allowing such a policy or custom to continue, (4) grossly negligent supervision of subordinates who committed a violation, or (5) failure to act on information indicating that unconstitutional acts were occurring.

Richardson v. Goord, 347 F.3d 431, 435 (2d Cir 2003).[5]

Moreover, Section 1983 liability cannot be predicated on a theory of respondeat superior. See City of Canton v. Harris, 489 U.S. 378, 385 (1989).

---

[5]     After Ashcroft v. Iqbal, district courts within the Second Circuit have been divided as to whether claims alleging personal involvement under the second, fourth, and fifth of these factors remain viable.  See Marom v. City of New York, 2016 WL 916424, at *15 (S.D.N.Y. Mar. 7, 2016) (collecting cases).  The Second Circuit has yet to resolve this dispute.  Id.

Here, plaintiff's only allegations respecting either Malfitano or Sciliano appear in the section of the complaint that identifies the named parties.  In other words, the complaint does not contain any allegations suggesting Malfitano or Sciliano directly participated in a constitutional violation, or failed to remedy a wrong after being informed of a constitutional violation, or created a policy or custom sanctioning conduct amounting to a constitutional violation, or were grossly negligent in the supervision of subordinates who committed a constitutional violation, or failed to act on information indicating that unconstitutional conduct was occurring.  See Richardson v. Goord, 347 F.3d at 435.  Indeed, plaintiff's factual recitation does not contain even a single allegation specifically referencing either Malfitano or Sciliano.

Accordingly, plaintiff fails plausibly to plead Malfitano's or Sciliano's personal involvement in an alleged constitutional violation, and his claims must be dismissed inasmuch as they are alleged against these two defendants.

III.    First Amendment Retaliation Claim

Defendants argue plaintiff fails plausibly to state a First Amendment retaliation claim.

The Court agrees.

To state a First Amendment retaliation claim under Section 1983, a plaintiff must plausibly allege:  (i) he engaged in constitutionally protected conduct; (ii) a defendant took adverse action against him; and (iii) the protected conduct and adverse action are causally connected.  Dolan v. Connolly, 794 F.3d 290, 294 (2d Cir. 2015).  When the alleged protected activity is political association, the plaintiff must plausibly allege such association was the cause of defendant's retaliatory action.  See Bearss v. Wilton, 445 F. App'x 400, 404 (2d Cir. 2011) (summary order).

With respect to the first element (protected conduct), the parties do not dispute whether plaintiff's and Tabatha's support for Philip's campaign constitutes constitutionally protected political association.  Accordingly, the Court considers in turn whether plaintiff plausibly alleges an adverse action and, if so, a causal connection between the protected conduct and the adverse action.

With respect to the second element (adverse action), "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action[.]"  Davis v. Goord, 320 F.3d 346, 353 (2d Cir. 2003).  Resignations are presumed to be voluntary, Nocera v. N.Y.C. Fire Comm'r, 921 F. Supp. 192, 201 (S.D.N.Y. 1996), and therefore do not generally constitute adverse employment actions.  However, plaintiff claims his resignation was coerced, as it was presented as the only alternative to facing a termination for cause, and as plaintiff purportedly was misled into thinking he would be compensated in accordance with his final paystub if he resigned.  Taking these allegations as true, plaintiff plausibly alleges an adverse employment action.

With respect to the third element (causal connection), plaintiff's "allegations must support an inference that the protected conduct was a substantial and motivating factor for the adverse action[]."  Dorsey v. Fisher, 468 F. App'x 25, 27 (2d Cir. 2012) (summary order).  "That is to say, [plaintiff must plausibly allege] the adverse employment action would not have been taken absent the employee's protected [conduct]."  Stajic v. City of New York, 214 F. Supp. 3d 230, 235 (S.D.N.Y. 2016).

"[T]he causal connection that a plaintiff must allege in order to survive a motion to dismiss a First Amendment retaliation claim may be alleged indirectly by, for example, alleging that the protected activity was followed by adverse treatment in employment, or directly, by

alleging direct evidence of retaliatory animus." Stajic v. City of New York, 214 F. Supp. 3d at 236.

"A plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action." Stajic v. City of New York, 214 F. Supp. 3d at 235 (quoting Espinal v. Goord, 558 F.3d 119, 129 (2d Cir. 2009)). Generally, "temporal proximity is strong circumstantial evidence of improper intent." Id. However, the length of time between the protected activity and the subsequent alleged incident of retaliation may suggest "a temporal gap that is too remote, by itself, to raise an inference of . . . causation." Raymond v. City of New York, 317 F. Supp. 3d 746, 769 (S.D.N.Y. 2018) (concluding that a period of over ten months between the protected activity and alleged retaliation "does not allow for an inference of causation"); see also Johnson v. N.Y.S. Office of Alcoholism & Substance Abuse Servs., 2018 WL 135258, at *5 (S.D.N.Y. Mar. 13, 2018) (noting temporal gap of more than nine months was too remote). "[T]he Second Circuit 'has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action.'" Chidume v. Greenburgh-North Castle Union Free Sch. Dist., 2020 WL 2131771, at *11 (S.D.N.Y. May 4, 2020) (quoting Espinal v. Goord, 558 F.3d at 129).

Plaintiff argues a causal connection between his protected activity and his resignation "is established by the threats [of Supervisor] Belmont" and "the timing of the actions taken against [plaintiff]." (Doc. #48 ("Pl. Mem.") at 14). In other words, he argues the complaint's allegations support an inference of causation both directly and indirectly.

Plaintiff is mistaken. First, he fails plausibly to allege facts suggesting a direct causal connection between his constitutionally protected political association and his allegedly coerced

resignation.  For instance, plaintiff argues Supervisor Belmont's remark, "You and your brother ruined my daughter's wedding and you're going to get yours" (Compl. ¶ 92), which was alleged by plaintiff "upon information and belief," "demonstrates animus as well as a threat of retaliation."  (Pl. Mem. at 17).  But plaintiff fails to support this statement with any context.  He does not mention when, where, or for what reason Supervisor Belmont allegedly made this remark, or how Belmont's daughter's wedding had anything to do with plaintiff's protected activity.  And although plaintiff argues in his opposition to the instant motion that "the clear implication [of this remark] was that [Supervisor Belmont] was seeking revenge for the embarrassment they caused him during the political campaign" (Pl. Mem. at 18), the complaint contains no such allegation.

In addition, plaintiff's other allegations, which he argues suggest direct evidence of retaliation—i.e., "upon information and belief," that Supervisor Belmont and the other defendants considered "as a personal affront" plaintiff's and Tabatha's support of Philip's campaign, and "vowed revenge against" plaintiff for same (Compl. ¶ 90), and that Belmont "held a grudge against Plaintiff as a result of his embarrassment at having to admit the falsity of his oaths as a Notary Public" (id. ¶ 91)—are entirely conclusory and fail plausibly to support plaintiff's retaliation claim.  That Philip campaigned in 2015 to unseat Supervisor Belmont, and that plaintiff and Tabatha supported Philip's campaign, alone do not support plaintiff's conclusory allegation that Belmont and defendants vowed revenge.  Moreover, plaintiff does not allege Supervisor Belmont, or any other defendant, was aware plaintiff had helped Philip locate witnesses to testify against Belmont in Philip's lawsuit respecting Belmont's campaign petitions.  Simply, these undeveloped allegations fail to support an inference of retaliatory intent with respect to conduct protected by the First Amendment.

Second, plaintiff also fails plausibly to allege facts suggesting an indirect causal connection between his political association and his resignation.  First, plaintiff and Tabatha supported Philip's political campaign against Supervisor Belmont in 2015.  Belmont defeated Philip in the Republican primary for Supervisor/Mayor on September 10, 2015, more than one year before plaintiff's resignation on October 7, 2016.  And although plaintiff alleges defendants' complaints regarding his recording and improper use of "accrued hours" was mere pretext for defendants' scheme to force plaintiff from his employment with the Department, he concedes he was not approached by defendants regarding his time records until October 2016, more than a year after Philip lost to Supervisor Belmont in the primary election.  (See Compl. ¶ 89).  Indeed, according to the complaint, it was not until October 2016 that Stout told plaintiff he was facing disciplinary charges for violating a Town resolution prohibiting department heads from earning and utilizing overtime hours, and that defendants presented plaintiff a choice between resigning or facing "charges that would result in termination for cause."  (Id. ¶ 69). Although there is "no hard and fast rule for the amount of time that must pass before a causal connection is necessarily broken," Birch v. City of New York, 184 F.Supp.3d 21, 32 (E.D.N.Y. 2016), here, plaintiff fails plausibly to suggest an inference of causation, based on temporal proximity, between his political association and his resignation.

Moreover, plaintiff does not plead any additional, circumstantial facts plausibly suggesting his political association with Philip was a factor in defendants' actions.  By plaintiff's own allegations, defendants' only cited reason for seeking plaintiff's resignation or termination for cause was that plaintiff was being paid overtime even though he was not entitled to overtime. Plaintiff alleges defendants were aware of his and former Chief Hall's practice of keeping logs of overtime hours, and never challenged plaintiff, or Chief Hall, about same, prior to plaintiff's

support of Philip's campaign.  To that end, plaintiff argues defendants' sudden enforcement of

Town policy in October 2016 can thus only be explained as pretext for defendants' retaliation

against him.

But here, plaintiff also alleges that at some time prior to 2010, when Hall was Chief of

Police, an independent investigation of Hall's accounting practices was conducted.  That such

investigation of Chief Hall's accounting practices was conducted belies plaintiff's allegations

that Chief Hall's accounting practices were never challenged, and that defendants' investigation

into plaintiff's accounting practices was a sudden, targeted effort to retaliate against him for his

and his wife's political activities.  And plaintiff does not plausibly allege or suggest any political

motivation for the investigation of Chief Hall's accounting practices prior to 2010.

Moreover, several Town resolutions annexed to plaintiff's complaint,[6] which prohibit the

Chief of Police and other department heads and managers from accruing overtime compensation,

further belie plaintiff's allegation that defendants' enforcement of Town policy can only be

explained as pretext for defendants' retaliation against him.

In sum, for all of the reasons set forth above, plaintiff fails plausibly to plead facts

sufficient to support an inference that his political association, rather than his recordkeeping and

payment practices, "was a substantial motivating factor" in the decision to demand his

resignation.  See Preschools of Am. (USA), Inc. v. N.Y.C. Dep't of Educ., 2018 WL 4265886, at

*4 (S.D.N.Y. Sept. 6, 2018).

Accordingly, plaintiff's First Amendment retaliation claim must be dismissed.

---

[6]     The Department's policy generally precluding the Chief of Police from accruing overtime
pay appears plainly in three separate Town Resolutions—2000-562; 2002-571; and 2005-035—
all of which are referenced in and attached to the complaint.

IV.     Due Process Claims

        As an initial matter, the complaint does not clearly delineate whether plaintiff's second

cause of action concerns procedural due process or substantive due process.  Nevertheless,

plaintiff alleges (i) he was constructively discharged, without a hearing, from his job as Chief of

Police; and (ii) his unlawful termination deprived him of protected property rights in his

continued governmental employment and owed compensation.  For the benefit of a complete

record, the Court will consider plaintiff's allegations to have raised both procedural due process

and substantive due process claims.

        A.      Procedural Due Process

        Defendants argue plaintiff fails plausibly to allege a procedural due process claim.

        The Court agrees.

        To state a valid claim for deprivation of procedural due process under Section 1983, a

plaintiff must plausibly allege he "possessed a protected liberty or property interest, and that he

was deprived of that interest without due process.'"  McMenemy v. City of Rochester, 241 F.3d

279, 285–86 (2d Cir. 2001).  "An essential principle of due process is that a deprivation of life,

liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature

of the case.'"  Richardson v. Kelaher, 1998 WL 812042, at *4 (S.D.N.Y. Nov. 19, 1998)

(quoting Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)).

        When a public employee resigns, "the only possible dispute is whether the resignation

was voluntary or involuntary," which "cannot be determined in advance."  Giglio v. Dunn, 732

F.2d 1133, 1135 (2d Cir. 1984).  In such a case, "a pre-deprivation hearing is impractical," so a

"meaningful" post-deprivation hearing satisfies due process.  Id.  A plaintiff's "fail[ure] to avail

himself of the opportunity" of a post-deprivation hearing is fatal to a procedural due process claim.  Id.

In New York, a police officer may bring an Article 78 proceeding, see N.Y. C.P.L.R. § 7801 et seq., to challenge the voluntariness of his resignation.  See Stenson v. Kerlikowske, 205 F.3d 1324 (tbl.), 2000 WL 254048, at *1 (2d Cir. Mar. 3, 2000) (summary order).  And a considerable line of Second Circuit precedent holds that the availability of a post-deprivation Article 78 proceeding satisfies a plaintiff's constitutional right to procedural due process.  See Fortunato v. Liebowitz, 2012 WL 6628028, at *5 (S.D.N.Y. Dec. 20, 2012) (citing Giglio v. Dunn, 732 F.2d at 1134–35); see also Hellenic Am. Neighborhood Action Comm. v. City of New York, 101 F.3d 877, 881 (2d Cir. 1996) ("An Article 78 proceeding is adequate for due process purposes even though the petitioner may not be able to recover the same relief that he could in a § 1983 suit.").

In Giglio v. Dunn, the Second Circuit confirmed that a plaintiff's post-deprivation remedy under Article 78 afforded sufficient process, noting that "[h]ad an Article 78 hearing been held, the court, with all the facts before it, could have determined whether [Giglio's] resignation was coerced, and avoiding the constitutional thicket, could have ordered such reinstatement and monetary relief as was appropriate."  732 F.2d at 1134.  "Thus, where an Article 78 proceeding would give the employee a meaningful opportunity to challenge the voluntariness of his resignation, the employee is not deprived of due process simply because he failed to avail himself of that opportunity."  Capul v. City of New York, 2020 WL 2748274, at *9 (S.D.N.Y. May 27, 2020).

Here, plaintiff did not bring an Article 78 proceeding to challenge the voluntariness of his resignation.  This renders implausible plaintiff's allegation that he was denied procedural due process.  See Stenson v. Kerlikowske, 2000 WL 254048, at *1.

Plaintiff argues a state remedy in the form of an Article 78 proceeding should not bar a due process claim.  As grounds therefor, plaintiff likens his circumstances to that of the plaintiff in DeSimone v. Board of Education South Huntington Union Free School District, 604 F. Supp. 1180 (E.D.N.Y. 1985), a case which addressed whether a school district's termination of a teacher's employment violated procedural due process.  But the facts of DeSimone are inapposite.  There, the Board of Education abolished the plaintiff dean's position, established a new, similar position, and refused to offer the plaintiff the new, allegedly equivalent position, which resulted in plaintiff's employment termination.  Id. at 1182.  The court distinguished the former dean's circumstances from that of the plaintiff in Giglio v. Dunn, noting:

> In Giglio v. Dunn, a tenured high school principal contended that he had been coerced to resign by superiors who informed him that his position would be abolished unless he resigned.  In that case, unlike the instant case, plaintiff's loss of his job did not result from a formal official action by a Board of Education, but rather was alleged to have resulted from the informal unofficial and unauthorized threats by individual superiors to plaintiff.

Id. at 1183–84.

Here, plaintiff's employment was not terminated by formal official conduct; rather, he resigned.  Thus, the lack of a hearing prior to his resignation did not deprive plaintiff of procedural due process.  "The point of Giglio is that resignations, even if involuntary, differ from firings and other typical deprivations in that they are not unilateral acts on the part of the employer and they do not purport to be for cause."  Capul v. City of New York, 2020 WL 2748274 at *10 (citing Giglio v. Dunn, 732 F.2d at 1134–35 ("When an employee resigns, the only possible dispute is whether the resignation was voluntary or involuntary, and this cannot be

determined in advance.")).  And here, like in <u>Giglio</u>, plaintiff alleges Supervisor Belmont, Stout, and Allegretti threatened plaintiff with disciplinary charges and called for his removal, which is far from official action by the Town or its Board.

Plaintiff also argues that the dissenting opinion in <u>Giglio</u> provides support for this procedural due process claim.

The Court declines to apply the <u>Giglio</u> dissent.  Indeed, courts in this circuit consistently cite <u>Giglio</u> as good law and applicable authority.  <u>See</u> <u>Capul v. City of New York</u>, 2020 WL 2748274, at *14 (collecting cases).  The Court sees no reason to do otherwise here.

Moreover, to the extent plaintiff raises a procedural due process claim with respect to compensation he claims he is owed, plaintiff had an opportunity to bring an Article 78 proceeding concerning those allegations as well, yet failed to do so.

Accordingly, plaintiff's procedural due process claim must be dismissed.

B.     Substantive Due Process

To the extent plaintiff alleges a Section 1983 substantive due process claim, such claim also must be dismissed.

Substantive due process respects "the right to be free of arbitrary government action that <u>infringes</u> a <u>protected</u> <u>right</u>."  <u>O'Connor v. Pierson</u>, 426 F.3d 187, 200 n.6 (2d Cir. 2005) (emphasis in original).  To state a substantive due process claim, a plaintiff must allege that the complained-of state action compromised a constitutionally-protected liberty or property right, and the state action that deprived plaintiff of that interest was oppressive or arbitrary.  <u>MC v. Arlington Cent. Sch. Dist.</u>, 2012 WL 3020087, at *5 (S.D.N.Y. July 24, 2012).

The plaintiff's allegations must demonstrate more than mere conduct that is incorrect or ill advised.  <u>Cunney v. Bd. of Trs. of Grand View</u>, 660 F.3d 612, 626 (2d Cir. 2011).  Rather, the

allegations must plausibly suggest the defendant's conduct is "such an egregious abuse of power that it 'shocks the conscience.'" Tessler v. Paterson, 768 F. Supp. 2d 661, 670 (S.D.N.Y. 2011) (quoting County of Sacramento v. Lewis, 523 U.S. 833, 848 n.8 (1998)).  Without such showing, a plaintiff cannot maintain a substantive due process claim.  Id.  Moreover, "courts in this circuit have consistently held that even where other alleged constitutional rights are implicated, terminating government employment does not shock the conscience and thus does not constitute a violation of substantive due process."  Id.

Here, plaintiff does not come close to stating a substantive due process claim.  He acknowledges he resigned from his position as Chief of Police, rather than face disciplinary charges and a disciplinary hearing respecting his overtime pay.  He alleges it was improper for defendants to seek his resignation—for improper accounting—because he was unaware of Town resolutions that might have prohibited his method of recordkeeping and collecting overtime, and that such resolutions were not enforced, prior to and during his tenure as Chief of Police, until defendants sought to remove plaintiff from the position.

But even assuming the truth of these allegations, the conduct complained of does not meet the requisite "shock the conscience" standard.  As noted above, a public servant's employment termination generally does not shock the conscience and thus does not constitute a violation of substantive due process.  Tessler v. Paterson, 768 F. Supp. 2d at 670.

Moreover, to the extent plaintiff asserts a substantive due process claim respecting defendants' alleged refusal to pay plaintiff compensation he claims to be owed, such claim too fails.  Indeed, "substantive due process does not protect 'run-of-the-mill contractually-based property interest[s]."  Irwin v. City of New York, 902 F. Supp. 442, 450 (S.D.N.Y. 1995) (alteration in original).  And the effect of defendants' alleged refusal to pay plaintiff certain

compensation he claims is due is not "so dramatic and the rights implicated so fundamental that the Constitution provides a remedy." Id. Rather, plaintiff's allegations respecting his entitlement to certain compensation are best suited for contract and other related claims under state law, claims which plaintiff has included in his complaint.

Accordingly, plaintiff's substantive due process claim, to the extent one is alleged, must be dismissed.

V.      State Law Claims

A district court may decline to exercise supplemental jurisdiction over state-law claims when it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3); Kolari v. New York-Presbyterian Hosp., 455 F.3d 118, 122 (2d Cir. 2006).

Having dismissed all federal claims over which the Court has original jurisdiction, the Court declines to exercise its supplemental jurisdiction over plaintiffs' state law claims.[7]

VI.     Sanctions

The Court declines to impose sanctions against plaintiff or his counsel.

"Sanctions may be—but need not be—imposed when court filings are used for an 'improper purpose,' or when claims are not supported by existing law, lack evidentiary support, or are otherwise frivolous." Ipcon Collections LLC v. Costco Wholesale Corp., 698 F.3d 58, 63 (2d Cir. 2012) (quoting Fed. R. Civ. P. 11(b)-(c)). Courts have broad discretion in determining whether to impose sanctions. Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 407 (1990). Indeed, "[e]ven if the district court concludes that the assertion of a given claim violates Rule 11,

---

[7]      Accordingly, the Court also declines to consider defendants' argument that the Court lacks subject matter jurisdiction to hear plaintiff's state law claims.

. . . the decision whether or not to impose sanctions is a matter for the court's discretion." Perez v. Posse Comitatus, 373 F.3d 321, 325 (2d Cir. 2004).

"In deciding whether the signer of a pleading, motion, or other paper has crossed the line between zealous advocacy and plain pettifoggery, the court applies an objective standard of reasonableness." United States v. Int'l Bhd. of Teamsters, 948 F.2d 1338, 1344 (2d Cir. 1991) (citing Bus. Guides, Inc. v. Chromatic Commc'ns Enters., 498 U.S. 533, 549–50 (1991)). Courts consider the following non-exclusive factors in deciding whether to impose sanctions:

> (1) whether the improper conduct was willful, or negligent; (2) whether it was part of a pattern of activity, or an isolated event; (3) whether it infected the entire pleading, or only one particular count or defense; (4) whether the person has engaged in similar conduct in other litigation; (5) what effect it had on the litigation process in time or expense; (6) whether the responsible person is trained in the law; [and] (7) what amount, given the financial resources of the responsible person, is needed to deter that person from repetition in the same case.

Vanacore v. Vanco Sales LLC, 2017 WL 2790549, at *6 (S.D.N.Y. June 27, 2017). "Rule 11 sanctions should be imposed with caution, resolving all doubts in favor of the party facing sanctions." Id.

Here, certain of plaintiff's claims border on frivolous. However, there is no suggestion plaintiff's conduct was part of a pattern of activity, or that plaintiff has engaged in similar conduct in other litigation. Nor do plaintiff's filings in this matter suggest he or his counsel presented allegations for an improper purpose, or to harass, unnecessarily delay, or increase the cost of litigation. Moreover, plaintiff's refusal to voluntarily dismiss certain claims pursuant to defense counsel's safe harbor letter did not have a significant effect on the litigation process in time or expense.

Accordingly, the Court declines to impose sanctions in this case.

23

**CONCLUSION**

The motion to dismiss is GRANTED.

The motion for sanctions is DENIED.

The Clerk is instructed to terminate the pending motions (Docs. ##42, 55) and close this

case.

Dated: September 10, 2020
       White Plains, NY

                              SO ORDERED:


                              _____
                              Vincent L. Briccetti
                              United States District Judge

24